Prince MAGBEGOR, Plaintiff,

v.

Gary Steven TRIPLETTE, Individually, Gary Steven Triplette d/b/a Triplette's Trucking, and Northland Insurance Company, Defendants.

CIVIL ACTION FILE NO.
1:15–CV–1811–MHC

United States District Court,
N.D. Georgia, Atlanta Division.

Signed 03/16/2016

**1320**

Alan J. Hamilton, Jeff P. Shiver, R. Scott Campbell, Shiver Hamilton, LLC, Atlanta, GA, for Plaintiff.

Mark Daniel Lefkow, Amanda Lowery Matthews, Nall & Miller, LLP, Atlanta, GA, for Defendants.

### ORDER

MARK H. COHEN, United States District Judge

This case comes before the Court on Defendants' Motion to Exclude the Opinion Testimony of Plaintiff's Designated Expert Phillip Langer, MD [Doc. 52] ("Defs.' Mot."). For the reasons stated below, the motion is **GRANTED.**

## I. BACKGROUND

The above-styled personal injury case arises out of a motor vehicle accident that occurred on June 7, 2013. Compl. [Doc. 1–1] ¶¶ 12–19. Defendants admit liability, specifically that Defendant Gary Steven Triplette "was negligent and that his negligence proximately caused his vehicle to collide with the side of Plaintiff's vehicle." Answer [Doc. 8] ¶¶ 14, 16. As a result of the accident, Plaintiff alleges that he suffered "severe and permanent injuries." Compl. ¶ 14. In support of Plaintiff's claim of damages, Plaintiff offers the testimony of Phillip R. Langer, M.D., who is expected to opine as to "(1) a description of the injury Plaintiff suffered and the cause of his pain and symptoms; (2) the past medical treatment including surgery necessitated by his injuries; (3) Plaintiff's physical condition and limitations; and (4) that the shoulder injury was more likely than not caused by the June, 2013 motor vehicle wreck." Pl.'s First Suppl. Disclosures dated October 22, 2015 [Doc. 52–3] attached as Ex. 2 to Defs.' Mot. Dr. Langer is a treating physician of Plaintiff who first saw Plaintiff on November 15, 2013, and later operated on Plaintiff's shoulder to repair the rotator cuff on February 19, 2014. Id.

Dr. Langer testified that Plaintiff's shoulder injury was caused by a motor vehicle accident:

Q. Is it your opinion within a reasonable degree of medical certainty that Mr. Magbegor's shoulder injury that you operated on was caused by a motor vehicle accident?

A. Yes.

* * *

Q. And was everything you saw medically consistent with the fact the injury

had occurred around the time of that motor vehicle wreck?

A. Yes.

Dep. of Phillip R. Langer taken Dec. 10, 2015 [Doc. 52–4] ("Langer Dep.") at 43, 48. Dr. Langer also stated, based on his education, training, experience, the patient history he received from Plaintiff, and his observations during his treatment of Plaintiff, that he did not "see anything in there that alarmed me of any chronicity to the injury." Id. at 9–10.

Dr. Langer explained that he reached his opinion based on the assumption that, if Plaintiff's injury was chronic (something the doctor defined in terms of being a "year or two years" old), Plaintiff's shoulder would have exhibited "atrophy of the muscle," "shrinkage of the muscle size," and "fatty infiltration," and Dr. Langer made no such observations. Id. at 11, 29; see also Id. at 14 (confirming that the MRI findings were consistent with his observations "[t]hat it's an acute versus chronic injury and correlate with something that would be within the time frame he was injured.").

During his deposition, Dr. Langer testified that he performed a physical examination of Plaintiff, reviewed his x-rays and his MRI imaging, and ultimately performed surgery on Plaintiff to repair his partially-torn rotator cuff. Langer Dep. at 6–8. Dr. Langer admitted he did not make any use of the medical history Plaintiff completed on the pre-printed form, but instead relied upon the oral history Plaintiff provided directly during their initial visit. Id. at 23–24 ("Q: did you make any use of this history Mr. Magbegor provided? A: No."). Dr. Langer memorialized the oral history Plaintiff gave as follows:

Prince is here as a new patient to me referred by Dr. Weeks. He was in a motor vehicle accident. He is a 24-year-old right hand dominant male who has left shoulder pain and weakness ever since his car accident when he was pinned in between a motor vehicle and a truck.

Dr. Langer pre-operative medical note dated November 15, 2013 [Doc. 52–11].

When Dr. Langer was questioned specifically about his observations and the timing of Plaintiff's injury, he testified as follows:

Q. But what's the range, I mean in terms of how long ago before your surgery, that this injury could have occurred?

A. So I can't answer that question because all I can say is that there was no atrophy and no contaminant damage either on MRI or intraoperatively that would suggest that this was greater than the time period that he outlined.

Everybody's going to react differently to an injury. Some people compensate more than others, so I can't give you an objective window. There is no way to do that.

* * *

Q. Can you say within a reasonable degree of medical certainty that it is more probable than not that Mr. Magbegor—or Mr. Magbegor's injury occurred in the year 2013?

A. That it did or did not occur?

Q. Did occur sometime in the year 2013.

A. No, I can't say that.

Langer Dep. at 56.

Although he did determine that the injury was consistent with an injury that could happen in a car wreck, Dr. Langer testified that he was not able to identify the event that had caused Plaintiff's injury. Id. at 12–13. Dr. Langer testified that he did not perform an analysis or obtain additional information from Plaintiff to exclude possible causes of Plaintiff's shoulder injury, other than the automobile accident,

because his observations were consistent with the story Plaintiff told him. Langer Dep. at 26–28, 43.

Q. Tell me how, if at all, from a scientific standpoint you excluded other possible causes of an acute shoulder injure [sic] besides a motor vehicle accident for Mr. Magbegor.

A. Again, I am at the mercy of what the patient provides. So if I ask you how it happened and Mr. Magbegor tells me he was in a motor vehicle accident, I believe the patient.

If there is not—if his mechanism of injury that he's describing doesn't correlate with my exam, then we will pursue other possibilities and I start looking for zebras. I did not have any reason to do that.

\* \* \*

Q. And how did you scientifically exclude other causes such as his other recreational activities from being a possible cause of his acute shoulder injury?

A. So I did not know about his other exercise. I did not obtain that. He did not provide that. And there isn't anything that I see scientifically that isn't consistent with the mechanism that he described.

Q. What is that mechanism?

A. A car accident that he said he was—what he told me, was pinned between a motor vehicle and a truck.

Q. And that's because of what he relayed to you about being pinned in between a motor vehicle and a truck?

A. That's what he told me, yes.

Q. That's what you believe to be the mechanism of his injury?

A. That's what he told me.

\* \* \*

Q. What do you believe, if you can testify within a reasonable degree of medical certainty, caused Mr. Magbegor's shoulder to have a tear in the anterior supraspinatus tendon?

A. I can't—I'm at the mercy of the records, so what he told me is what he told me.

Id. at 43–44. Dr. Langer admitted that Plaintiff could have injured his shoulder lifting weights, doing gymnastics, or doing "Insanity" workouts, but he had no knowledge of whether Plaintiff was engaging in these activities. Id. at 28, 36–37.

Q. As we sit here today, can you scientifically or medically exclude as a cause of Mr. Magbegor's injury to his left shoulder weightlifting, an Insanity workout, tumbling, handsprings, roundoffs or other gymnastics?

A. I cannot do that, no.

\* \* \*

Q. Are you saying that if he would have told you all those things about his recreational activities, you might not have put in your preoperative note that this was caused by a motor vehicle accident?

A. There is no way for me to determine the causality specifically without getting an MRI after every workout that he did, an MRI after the motor vehicle accident. You have to have MRIs after every specific incident to determine that fact. I'm at the mercy of what the patient tells me.

Id. at 45, 51.

Apart from his observation that Plaintiff's shoulder muscle did not exhibit atrophy or fatty infiltration, Dr. Langer did not employ any scientific method or theory in reaching his conclusion:

Q. In coming to your opinions, did you use any methods that have a known or potential error rate? I'm talking specifically about your opinions as to the cause of Mr. Magbegor's injury.

A. Yeah, nothing's a hundred percent.

Q. Do you have anything else to say about any known or potential error rate

of any methodology you employed to make that determination?

A. No.

Q. Are there any generally accepted or peer-reviewed theories that you employed in coming to your opinions in this case regarding the cause of Mr. Magbegor's shoulder injury?

A. I only focus on the cause, to be honest with you, so I take a patient at its word—at their word and then I treat the problem. I don't get into the causation factor. It's a fair question. I'm just being honest with you, so.

Id. at 45.

## II. LEGAL STANDARD

■ Federal law applies to the admissibility of expert testimony in this case. Flury v. Daimler Chrysler Corp., 427 F.3d 939, 944 (11th Cir. 2005) (in diversity cases, the Federal Rules of Evidence govern the admissibility of evidence in federal court); see also Hendrix ex rel. G. P. v. Evenflo Co., 609 F.3d 1183, 1193 (11th Cir. 2010) ("Although the standards for finding causation are governed by [state] law, we apply federal law to determine whether the expert testimony proffered to prove causation is sufficiently reliable to submit it to the jury."). Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The Supreme Court has directed that

[u]nlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. See Rules 702 and 703. Presumably, this relaxation of the usual requirement of firsthand knowledge ... is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.

Daubert v. Merrell Dow Pharms., 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Because of the broader range of testimony permitted under Rule 702, the Supreme Court has indicated that district courts are to perform a critical "gatekeeping" function concerning the admissibility of all expert testimony to ensure that an expert witness's testimony is not only relevant, but reliable. United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); Daubert, 509 U.S. at 589 n.7, 597, 113 S.Ct. 2786). In particular, district courts are "charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." Corwin v. Walt Disney Co., 475 F.3d 1239, 1250 (11th Cir. 2007).

■ In performing this gatekeeping function, Eleventh Circuit has developed "a rigorous three-part inquiry" to determine the admissibility of expert testimony under Rule 702, that considers whether:

(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as de-

termined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Frazier, 387 F.3d at 1260 (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)). "While there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them." Id.

"A district court's gatekeeper role under Daubert 'is not intended to supplant the adversary system or the role of the jury.'" Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) (quoting Allison v. McGhan, 184 F.3d 1300, 1311 (11th Cir. 1999)); accord Daubert, 509 U.S. at 596, 113 S.Ct. 2786 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); Adams v. Lab. Corp. of Am., 760 F.3d 1322, 1332, 1334 (11th Cir. 2014) ("Bias in an expert witness's testimony is usually a credibility issue for the jury.... The risk of bias would mean, at most, that [the expert's] testimony is to some extent 'shaky,' and shakiness goes to the weight of her testimony, not its admissibility.") (citations omitted). Rather, the Court's role as a gatekeeper under Daubert "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., 526 U.S. at 152, 119 S.Ct. 1167 (1999).

The proponent of expert testimony "always bears the burden to show that his expert is qualified to testify competently regarding the matters he intended to address; the methodology by which the expert reached his conclusions is sufficiently reliable, and the testimony assists the trier of fact." Frazier, 387 F.3d at 1260 (quoting McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002) (internal punctuation omitted)); see also Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla., 402 F.3d 1092, 1107 (11th Cir. 2005) (explaining that it is the proponent's burden to lay the foundation for admission of expert testimony).

## A. Qualification of the Expert

There are various ways for determining whether an expert is qualified. "While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." Frazier, 387 F.3d at 1260–61. Federal Rule of Evidence 702 provides that an expert's qualification may be based on "knowledge, skill, experience, training, or education." FED. R. EVID. 702 advisory committee's note (2000 amends.) ("Nothing in this amendment is intended to suggest that experience alone ... may not provide a sufficient foundation for expert testimony."). Thus, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field." Santos v. Posadas De Puerto Rico Assocs. Inc., 452 F.3d 59, 63 (1st Cir. 2006).

## B. Reliability of the Principles and Methodology

Rule 702, in conjunction with Rules 403 and 703, imposes a standard of evidentiary reliability that contrasts with the generous approach to admissibility reflected in Rules 401 and 402. Allison, 184 F.3d at 1310; see also Kumho Tire Co., 526 U.S. at 149, 119 S.Ct. 1167; Daubert 509 U.S. at 589–91, 113 S.Ct. 2786. The

district court has "substantial discretion in deciding how to test an expert's reliability and whether the expert's relevant testimony is reliable." United States v. Majors, 196 F.3d 1206, 1215 (11th Cir. 1999) (citation and quotation omitted). Specifically, when expert "testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, ... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" Kumho Tire Co., 526 U.S. at 149, 119 S.Ct. 1167 (quoting Daubert 509 U.S. at 592, 113 S.Ct. 2786).

■■■■ "[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable." Allison, 184 F.3d at 1312 (citation omitted). Thus, the inquiry into reliability must focus on "principles and methodology" and not the expert witness's conclusions. Daubert, 509 U.S. at 595, 113 S.Ct. 2786. While an expert's qualifications may bear on the reliability of his proffered testimony, qualifications alone do not guarantee reliability. Frazier, 387 F.3d at 1261 (citing Quiet Tech. DC–8, Inc., Inc. v. Hurel–Dubois UK Ltd., 326 F.3d 1333, 1341–42 (11th Cir. 2001)). Because "one may be considered an expert but still offer unreliable testimony," it remains a basic foundation for admissibility under Rule 702 and Daubert that proposed expert testimony must be based on "good grounds." Id.

■■■ Daubert delineates a list of "general observations" for determining whether expert testimony is sufficiently reliable to be admitted under Rule 702, including: (1) whether the theory in question can be and has been empirically tested, that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the theory in question has been subjected to peer review and publication; (3) the theory's known or potential error rate and whether that rate is acceptable; and (4) whether the theory is generally accepted in the scientific community. Daubert, 509 U.S. at 593–94, 113 S.Ct. 2786; see also City of Tuscaloosa, 158 F.3d at 566 n. 25. The advisory committee notes for Rule 702 have collected additional factors that courts consider in assessing the reliability of expert testimony:

(1) Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.

(2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.

(3) Whether the expert has adequately accounted for obvious alternative explanations.

(4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.

(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

FED. R. EVID. 702 advisory committee's note (2000 amends.) (internal quotation marks and citations omitted).

### C. Assistance to the Trier of Fact

■■■ Finally, the Court must assess whether the expert testimony is helpful to the trier of fact. This factor turns on whether the expert testimony "concerns matters that are beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262. "Proffered expert testimony generally will not help the trier of fact

when it offers nothing more than what lawyers for the parties can argue in closing arguments." Id. at 1262–63.

## III. ANALYSIS

In the present motion, Defendants do not contest Dr. Danger's qualifications, but argue that Dr. Danger's opinion testimony should be excluded because it is "unreliable, misleading, confusing, and [would] not be helpful to jury." Defs.' Mot. at 1. Specifically, Defendants argue that his testimony "fails to reliably apply medical and scientific principles," is "contrary to published medical research, unhelpful to the jury, misleading, and any probative value of his opinion testimony is substantially outweighed by the danger of unfair prejudice to Defendants." Defs.' Br. in Supp. of Defs.' Mot. [Doc. 52–1] ("Defs.' Br.") at 3. Alternatively, Defendants argue that the opinions expressed during his deposition should be excluded as beyond the scope of his expert disclosure. Id. Although Defendants do not challenge Dr. Danger's qualifications, the Court will briefly address his qualifications before turning to the issues of the reliability of his opinion testimony and whether it would be helpful to the jury.

### A. Qualification of Dr. Langer

██ Dr. Langer is an orthopedic surgeon who is Board-certified in orthopedic surgery and sports medicine. Langer Dep. at 5–6. He has an undergraduate degree from the University of Notre Dame, a master's and medical degree from Georgetown University, completed his medical residency at Brown University, and then completed three fellowships in trauma, sports medicine, and hip arthroscopy. Id. at 5. He has been practicing as an orthopedic surgeon since 2008, routinely perform-

ing shoulder, hip, and ankle surgeries. Id. at 5–6. Based on this training, education and experience, the Court finds that Dr. Langer is qualified to testify as an expert in the area of orthopedic surgery and shoulder injuries.

### B. Reliability of Dr. Langer's Principles and Methodology

██ Defendants argue that Dr. Langer's testimony as to causation, the timing of Plaintiff's shoulder injury, and the description of the injury as "acute," must be excluded because Dr. Langer did not employ a reliable methodology. Defs.' Br. at 15. Specifically, Defendants contend that, when an expert physician testifies as to causation, he is "expected to employ a differential etiology, or differential diagnosis, analysis to narrow down the cause of injury to one cause." Id. (citing Hendrix, 609 F.3d at 1195).[1] Plaintiff counters that Defendant's insistence that Dr. Langer's opinion must be traceable to any reliable scientific methodology, let alone a differential etiology, is not necessary under Rule 702, Daubert, and its progeny. Pl.'s Br. In Resp. and Opp'n to Def.'s Mot. [Doc. 55] ("Pl.'s Resp.") at 4. Plaintiff maintains that, as the treating physician, Dr. Langer's testimony as to causation is sufficiently reliable based solely on his personal knowledge and experience. Id.

The Court finds that there is nothing magical about the differential etiology that would require Plaintiff's expert to employ that particular method in this case for his testimony to be reliable. See U.S. v. Scott, 403 Fed.Appx. 392, 397 (11th Cir. 2010) (recognizing that the district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is re-

---

1. The Eleventh Circuit explains that "[d]ifferential etiology, is medical process of elimination whereby the possible causes of a condi- tion are considered and ruled out one-by-one, leaving only one cause remaining." Hendrix, 609 F.3d at 1195.

liable.") (quoting <u>Kumho Tire Co.</u>, 526 U.S. at 152, 119 S.Ct. 1167). Defendant has provided no authority to the contrary.[2]

■■■ Although no expert physician is required to employ differential etiology or any other particular scientific method to arrive at their conclusion, their principles and methodology "must be supported by appropriate validation," so that the trial court does more than "simply taking the expert's word for it." <u>Frazier</u>, 387 F.3d at 1261 (internal punctuation and citations omitted). As detailed in Section II (B) *supra*, <u>Daubert</u> provided a non-exclusive list of factors to consider in testing an expert's testimony's reliability. Although he does not explain the basis for his opinion, it is clear that Dr. Langer's opinion as to causation is entirely based on the premise that a chronic shoulder injury (something he defines as a "year or two" old) would have exhibited "atrophy of the muscle," "shrinkage of the muscle size," and "fatty infiltration." Dr. Langer deduces that because he did not observe any of the characteristics of a chronic injury, Plaintiff's shoulder injury must have been acute (something that presumably would be less than a "year or two" old). Given that the subject car wreck is the only incident Plaintiff informed Dr. Langer about during their initial meeting that would be consistent with his observation that there were no signs of a chronic injury, Dr. Langer concluded that the car wreck was the cause of Plaintiff's injury.

With regard to Dr. Langer's theory of causation, Plaintiff has not satisfied any of the four <u>Daubert</u> factors: Dr. Langer has not demonstrated that his causation opinion is testable or has been tested; he has

not presented any evidence that his opinion has been peer reviewed or that he used a peer reviewed source to reach his opinion; he has not offered any error rate for his opinion; and he has not shown that his opinion (or even the central premise to his opinion) has been generally accepted. Consequently, his opinion fails all four of the <u>Daubert</u> factors, which highlights the unreliable nature of Dr. Langer's causation testimony.

■■■■ At the outset, the Court notes that neither Plaintiff nor Dr. Langer has presented any evidence that the central premise underlying his opinion (that chronic injuries exhibit certain characteristics) is generally accepted in the medical community. Nor is there any evidence that the absence of such characteristics can lead one to deduce that the injury is acute. There is no evidence to support Dr. Langer's vague notion that a chronic injury is one that is a "year or two" old. In applying <u>Daubert</u> and other relevant criteria, the Court must determine if the expert unjustifiably extrapolated from an accepted premise to an unfounded decision. <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("[N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). In other words, there must not be too "great an analytical gap between the data and the opinion proffered." <u>Id.</u> The Court must be assured that the expert is using the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire</u>, 526 U.S. at 152, 119 S.Ct. 1167. Plaintiff

---

**2.** Although the expert in the primary case Defendant relies upon employed the differential etiology method to link a traumatic brain injury to plaintiffs autism, there is no ruling in that case that this method must be used by doctors generally to support their expert testimony. See <u>Hendrix</u>, 609 F.3d at 1195 ("We have previously noted that, when applied under circumstances that ensure reliability, the differential etiology method <u>can</u> provide a valid basis for medical causation opinions.") (emphasis added).

has provided no such assurance in this case.

Not only has Plaintiff failed to present any evidence that Dr. Langer's causation opinion (or the underlying premise that a chronic injury has certain characteristics) is testable or has been tested, the only evidence before the Court is a study presented by Defendant which suggests some of the chronic characteristics considered by Dr. Langer do not develop until three or four years after a traumatic injury. See Barbara Melis, Michael J. DeFranco, Christopher Chuinard, & Giles Walch, Natural History of Fatty Infiltration and Atrophy of the Supraspinatus Muscle in Rotator Cuff Tears, Clinical Orthopaedics Related Research 1498–1505 (2010) [Doc. 52–10] attached as Ex. 9 to Def.'s Mot. The conclusions reached by this study (that it takes three to four years to develop the chronic characteristics) are catastrophic to Dr. Langer's theory of causation. If it takes an individual three to four years to develop the chronic characteristics, there was a much larger window of time within which Plaintiff could have incurred his injury other than from a motor vehicle accident that occurred on July 7, 2013.

Defendants have cited to a medical record from Wellstar Urgent Care, documenting an instance in which Plaintiff presented to an emergency center on October 11, 2011, complaining of pain in the same shoulder upon which Dr. Langer operated. Wellstar Urgent Care Note dated October 11, 2011 [Doc. 52–8]. Another one of Plaintiff's medical records suggests he performed an "Insanity" home exercise program before the injury. Scott D. Gillogly Note dated December 4, 2014 [Doc. 52–7]. Further, Plaintiff's deposition testimony reveals he has participated in Parkour and

has performed cartwheels, back flips and handstands almost all his life. Dep. Of Prince Magbegor dated August 18, 2015 [Doc. 52–5] at 11–12. Dr. Langer conceded that these activities could have resulted in the injury to Plaintiff's shoulder, which completely undermines his theory that the July, 2013, accident was the cause of the injury. Langer Dep. at 28, 36–37, 45, 51.

An analysis of the additional factors in the Rule 702 advisory committee notes further exposes the unreliable nature of Dr. Langer's causation theory. Most obvious is Dr. Langer's failure to account for any alternative explanations for Plaintiff's injury. There is also no evidence of any research Dr. Langer has conducted on this subject outside of this litigation. Further, there is no evidence that the premise upon which Dr. Langer's theory rests (that chronic injuries exhibit atrophied muscle and fatty infiltration and the absence of these observations signals an acute injury) is a generally accepted premise. Additionally, the only scientific evidence that would support any conclusion as to when chronic injuries begin to exhibit distinct characteristics before the Court belies Dr. Langer's conclusion in this case.

In addition to the Daubert and the advisory committee factors examined above, Dr. Langer has conducted no independent inquiry about the automobile accident that Plaintiff told him resulted in the shoulder injury.[3] Without any of the most basic details of the car wreck (for example, the speed at which the vehicles were traveling, the violence of the impact, the direction bodies may have moved, and the positioning of Plaintiff within the car), Dr. Langer's opinion as to Plaintiff's shoulder injury being caused by the accident is sus-

---

3. "[A] federal court should consider any additional factors that may advance its Rule 702 analysis." Quiet Tech. DC–8, Inc., 326 F.3d at 1341; see also Frazier, 387 F.3d at 1262

("Sometimes the specific Daubert factors will aid in determining reliability; sometimes other questions may be more useful.").

pect. Dr. Langer's conclusion was based on the assumption that Plaintiff was "pinned in between a motor vehicle and a truck." The Court has no way of assessing what role, if any, this description had in the formation of Dr. Langer's causation opinion.

As a consequence of not satisfying any of the Daubert, advisory committee, or other factors, the Court is unable to conclude that Dr. Langer's opinion is reliable. See Daubert, 509 U.S. at 590, 113 S.Ct. 2786 (stating that an expert's methodology should not be founded on subjective belief or unsupported speculation); Frazier, 387 F.3d at 1265 (finding expert's opinion unreliable because he offered little in the way of a reliable foundation or basis for his opinion); Dukes v. Georgia, 428 F.Supp.2d 1298, 1313–14 (N.D. Ga. 2006), aff'd sub nom. Dukes v. State of Georgia, 212 Fed. Appx. 916 (11th Cir. 2006) (finding expert unreliable in part because he offered no support for his statements, basis for his conclusions, or specific experience or material upon which he relied in making his conclusions). Indeed, Dr. Langer's entire theory of causation is based on his assumption that he can identify characteristics that signal the timing of the injury, but he could not conclude within a reasonable degree of medical certainty that Plaintiff's injury occurred in 2013, let alone was caused by the car wreck. Langer Dep. at 56; see Daubert, 509 U.S. at 590, 113 S.Ct. 2786 ("[P]roposed expert testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known."); FED. R. EVID. 702 advisory committee's note ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."). Consequently, Dr. Langer's opinion as to causation, the timing, or any description that might con-note the timing of the injury (i.e., "acute" or "chronic") is not sufficiently reliable under Daubert and Rule 702.

### C.   Assistance to the Trier of Fact

■ At best, Dr. Langer's testimony is that his observations of Plaintiff's shoulder injury are not consistent with an injury that would have occurred a "year or two years" before his operation in February, 2014. Dr. Langer deduces from this observation that there must be some temporal proximity between Plaintiff's injury and its cause. Because the June, 2013 car wreck is the only event that Plaintiff made Dr. Langer aware of, Dr. Langer accepted this event as the cause of Plaintiff's injury. As shown above, this reasoning is rife with flaws and unreliable. For the same reasons, the Court finds that it would fail to assist the trier of fact in any meaningful way. See McDowell v. Brown, 392 F.3d 1283, 1299 (11th Cir. 2004) ("Under Daubert, scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts. See Daubert, 509 U.S. at 591, 113 S.Ct. 2786. For example, there is no fit where a large analytical leap must be made between the facts and the opinion."); Frazier, 387 F.3d at 1266 ("[The expert's] imprecise opinion easily could serve to confuse the jury, and might well have misled it. More importantly, ... the methodological foundation or reliability of [the expert's] opinion was sufficiently slender to allow the district court to conclude that the trier of fact would not be assisted by the opinion.").

Because Plaintiff has not demonstrated by a preponderance of evidence that Dr. Langer employed a reliable methodology to reach his opinions and his opinion testimony would be helpful to a jury, his opinions are subject to exclusion under Rule 702 and Daubert.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Exclude the Opinion Testimony of Plaintiff's Designated Expert Phillip Langer, MD [Doc. 52] is **GRANTED.**

**IT IS SO ORDERED** this 16th day of March, 2016.